IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Dean Lucas, | ) | C/A No.: 1:08-4051-HFF-SVH |
| Plaintiff, | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| ML Rivera, US Attorney for the District of SC, Attorney General of the US, Robert Vendel, Mrs. Bradley, Regional Director of the SERO of the BOP, RE Holt, and Harley Lappin, | ) | |
| Defendants. | ) | |

Plaintiff, Dean Lucas, proceeding pro se, brings this civil action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971). Plaintiff, a federal prisoner, was previously an inmate at the Federal Correctional Institution (FCI) in Estill, South Carolina, a facility of the Bureau of Prisons (BOP), and files this action *in forma pauperis* under 28 U.S.C. § 1915.

Before the court is Defendants' Motion for Summary Judgment [Entry #61]. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Rule 73.02(B)(2)(d) and (e) (D.S.C.), the undersigned is authorized to review such complaints for relief. Because the motion for summary judgment is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

I.  Factual and Procedural Background

Plaintiff filed his complaint in this action on December 18, 2008, [Entry #1] and his amended complaint was filed on June 25, 2009 [Entry #37] (hereinafter referred to as

"the complaint"). Defendants' motion for summary judgment was filed on December 14, 2009. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised Plaintiff of the summary judgment and dismissal procedures and the possible consequences if he failed to respond adequately to Defendants' motion [Entry #63]. Plaintiff filed a timely response in opposition to Defendants' motion on January 27, 2010 [Entry #68]. Having carefully considered the parties' submissions and the record in this case, the court recommends Defendants' motion for summary judgment be granted.

This matter concerns Plaintiff's claim that Defendants have acted with deliberate indifference to Plaintiff's serious medical needs. Specifically Plaintiff claims he was on treatment for hepatitis C prior to his self-surrender on February 26, 2007, and Defendants have violated his Eighth Amendment rights by failing to continue this course of treatment.

On August 14, 2006, Plaintiff's attorney Robert A. Napier, wrote a letter to the Honorable Loretta A. Preska, United States District Court, Southern District of New York, requesting the court continue the sentencing of Plaintiff until he completed his medical treatment program. (*See* Entry #61-5) Mr. Napier attached two letters from Dr. Scott Fuchs, Plaintiff's private physician. (*Id.*) In the first letter, dated April 6, 2006, Dr. Fuchs indicated he had been seeing Plaintiff since February 8, 2006, and Plaintiff had been diagnosed with chronic hepatitis C subtype 1a. (*Id.*) Dr. Fuchs recommended the standard treatment, Pegylated Interferon and Ribavirin for Plaintiff. (*Id.*) He anticipated the treatment course to be 48 weeks and stated that "[t]here is no urgency as far as when

we begin the treatment as [Plaintiff] has probably had this infection for many years." (*Id.*) He went on to state that he "cannot state how badly his liver is affected without having a liver biopsy, which he does not routinely do in these cases." (*Id.*) He also stated that Plaintiff's "liver function looks quite good on the basis of his blood tests." (*Id.*) He indicated he would not advise to wait ten years to begin therapy, but if Plaintiff is incarcerated, he "could only undertake the course of treatment if he is able to see a gastroenterologist regularly, have access to medicine regularly, and have a frequent blood test taken." (*Id.*) He then stated that this "might prove to be a logistical problem depending on the resources available." (*Id.*)

In the second letter from Dr. Fuchs dated July 26, 2006, Dr. Fuchs indicated Plaintiff was under his care receiving treatment for chronic hepatitis C. (*Id.*) He stated Plaintiff should complete the treatments on or about February 19, 2007. (*Id.*) Mr. Napier sent a copy of this letter to Alexander H. Southwell, the AUSA handling the case against Plaintiff. (*Id.*) Upon receiving the letter, AUSA Southwell contacted the BOP Regional Counsel at the Northeast Regional Office (NERO) for information as to the availability of such treatment in the BOP. (*See* Entry #61-6).

On August 28, 2006, Health Services Administrator for the NERO, Barbara Cadogan, responded to AUSA Southwell stating if Plaintiff was committed to the custody of the BOP, he may be reviewed for designations by BOP Medical Designations to see if a medical facility or general population institution would be the appropriate facility for Plaintiff. (*Id.*) She noted upon his arrival to his newly designated institution, "Health

Services staff would review available records and examine Mr. Lucas to determine a proper course of treatment for his medical condition." (*Id.*) Cadogan explained that "Mr. Lucas would have the opportunity to see health care providers on a regular basis either by attending sick call, which is offered daily, or through monitoring in one of the BOP's chronic care clinics." (*Id.*) She acknowledged that the BOP standard treatment for hepatitis C includes the medication regimen of interferon and Ribavirin. (*Id.*) Cadogan also stated, "[b]ased on the representations provided in the above referenced documents, and consistent with BOP practice, it is my expectation that upon arrival to his designated institution, Mr. Lucas' medication regimen will be continued without interruption." (*Id.*) Cadogan stated "to ensure a smooth transition once a designated institution is established, Mr. Lucas' current physician is invited to contact the Health Service Administrator to inform him of the treatment of Mr. Lucas is receiving, as well as make any recommendation regarding his further care." (*Id.*)

In opposing a continuance of Plaintiff's sentencing, AUSA Southwell attached the letter from Cadogan. (*Id.*) On November 6, 2006, Plaintiff was sentenced by the United States District Court for the Southern District of New York to a 121-month term of incarceration. Plaintiff self-surrendered on February 26, 2007, to FCI Estill. At this time, the Inmate Personal Property Record does not indicate Plaintiff arrived with any type of medication or medical records and his medical records are void of any medication or records he arrived with on this date. (*See generally* Entry #61-9).

On February 27, 2007, Plaintiff was seen by medical staff complaining of a red rash on his entire body which he thought was an aggravation of his asthma. [Entry #61-8 at 2]. During this visit, Plaintiff did not mention that he had hepatitis C or that he was taking medication for his hepatitis C. (*Id.*) On February 28, 2007, Plaintiff completed a Medical History and indicated he was taking Albuterol and had asthma and hepatitis C. (*Id.* at 4–6). Plaintiff listed "liver and breathing" when asked whether he had any other medical or mental health concerns (*Id.*) Plaintiff did not mention he was taking any type of medication for his hepatitis C, although Plaintiff claims he was rushed while completing the Medical History. (*Id.*; *see also* Entry #67-1). The staff noted that Plaintiff was the sole source of the information received and there were no medical records provided. (*Id.* at 7–10). Plaintiff was informed he would be seen by the Clinical Director within fourteen days and was provided medication for his asthma. (*Id.* at 7–8). On March 7, 2007, medical staff conducted a physical on Plaintiff, and again went over his past medical history. (*Id.* at 10–12). According to his medical records, at no time during this physical did Plaintiff mention he was undergoing treatment for hepatitis C by his private physician. (*Id.*)

On March 8, 2007, during an examination by Defendant Dr. Vendel, Plaintiff reported that his treatment for his hepatitis C was incomplete, but had no documentation describing the treatment prior to incarceration. (*Id.*) According to Dr. Vendel, without such records, he first had to confirm a diagnosis of hepatitis C, as required by the BOP Clinical Practical Guidelines, by ordering diagnostic tests including a complete CBC

study and hepatitis profile. (*Id.* at 14–15; *see also* Aff. Vendel, Entry #61-10). Dr. Vendel also educated Plaintiff on the plan of action at that time and gave him preventative measures to prevent spreading his condition. (*Id.*) He informed Plaintiff that he would be monitored regularly in the Chronic Care Clinic. (*Id.*) On March 29, 2007, Dr. Vendel made a notation in Plaintiff's medical records indicating the lab results confirmed Plaintiff tested positive for anti-HCV (which is also known as chronic hepatitis C). (*Id.* at 15–17). Dr. Vendel ordered a qualitative HCV nucleic acid test because such test is required before initiating antiviral therapy, regardless of HCV genotype. (*Id.* at 15; *see also*, Entry #61-12, pgs. 23, 28, & 62).

On April 25, 2007, approximately two months after his arrival, Plaintiff signed up for sick call stating he was previously receiving Ribavirin and Interferon treatment for his hepatitis C before he was incarcerated and this treatment stopped since he arrived at FCI Estill. (*See* Entry #61-8 at 18). On May 7, 2007, an administrative note indicated Plaintiff received instructions related to the follow-up of his condition and Plaintiff understood. (*Id.* at 19). On June 25, 2007, Plaintiff signed up for sick call complaining his liver was hurting. (*Id.* at 21). He was given an appointment for July 17, 2007. (*Id.*) On July 17, 2007, stated he had received 31 weeks out of 48 weeks of Ribavirin and Interferon treatment for his hepatitis C before he was incarcerated. (*Id.*) Lab results reveal his liver enzymes were within normal limits. (*Id.*) At this time, a viral load test was ordered. (*Id.* at 22).

On September 20, 2007, Plaintiff was seen in Chronic Care Clinic where more diagnostic tests were ordered including CBC and viral load. (*Id.* at 25–26). On November 8, 2007, the results of Plaintiff's hepatitis C viral load showed he had a high viral load, i.e., greater than 700,000 IU/mL. (*Id.* at 30). According to Dr. Vendel, this finding, along with his blood work results of March 2007, indicates that any antiviral treatment he received prior to incarceration was not working. (Vendel Aff., Entry #65-10).

Plaintiff did not report back to medical until March 19, 2008, when he was seen for his Chronic Care Clinic appointment for his hepatitis C and other medical conditions (asthma, low back pain). (*See* Entry #61-8 at 32–33). More diagnostic tests (CMP, CBC, HCV-RNA, genotyping) were ordered and he was given another Chronic Care Clinic appointment. (*Id.*).

On April 29, 2008, Plaintiff signed up for sick call requesting continuation of the Interferon and Ribavirin treatment that was interrupted when he reported to prison. (*Id.* at 36). On May 8, 2008, Plaintiff was seen for his sick call appointment, where he was educated on his lab results, which indicated he was within normal limits, and counseled on when treatment would be appropriate. (*Id.*) He was informed that one of the diagnostic test results was still pending and to return as needed. (*Id.*)

On July 25, 2008, Plaintiff signed up for sick call stating he was unable to stay awake and he was always tired and worn out because of his hepatitis C. (*Id.* at 38). Additional lab work indicated Plaintiff has a Genotype 1 and his viral load was still over 700,000 IU/mL. (*Id.* at 40–42). On October 24, 2008, Plaintiff was scheduled for a

Chronic Care Clinic appointment to discuss his labs as well as to follow-up and check the status of his health. (*Id.* at 43). Plaintiff refused to see his provider for this visit because he stated he wanted to see the physician. (*Id.*)

On October 25, 2008, Plaintiff sent an Inmate Request to Staff Member to the Staff Physician complaining that FCI Estill was not capable of attending to his medical needs. (*Id.* at 44–46). In response, the physician stated he has requested a liver biopsy for Plaintiff to determine the appropriateness of treatment. (*Id.*) He informed Plaintiff that all the data will be submitted to the Regional Medical Director for review and request for hepatitis C treatment. (*Id.*) On October 30, 2008, medical staff wrote a consult for Plaintiff to see a gastroenterologist.

On December 1, 2008, Plaintiff was seen by the gastroenterologist to see if he needed a liver biopsy. (*Id.* at 5–51). He told the gastroenterologist that he had received approximately 35 weeks of Interferon in combination with ribavirin and apparently had a viral clearance during treatment. (*Id.*) However, after his treatment stopped, the viral load relapsed. (*Id.*) The gastroenterologist noted Plaintiff told him that he had a liver biopsy in 2005, and therefore, based on this statement, it was his recommendation that Plaintiff did not need a repeat liver biopsy. (*Id.*). The gastroenterologist stated in his report that it is critical to review the previous treatment records to see if Plaintiff actually achieved viral clearance during treatment and at which point during treatment he had clearance viral load. (*Id.*) He also noted that it would also be beneficial to see if he developed neutropenia, thrombocytopenia, or anemia during treatment. (*Id.*)

On January 7, 2009, Plaintiff was seen in Chronic Care Clinic. (*Id.* at 54–58). The provider noted Plaintiff has a history of HCV, asymptomatic, liver enzymes within normal limits. (*Id.*) An examination showed Plaintiff had no fatigue, insomnia, or weakness. (*Id.*) Additional lab work was ordered for a hepatitis profile, CBC, and WBC. (*Id.*) The provider explained to Plaintiff the plan of care including Plaintiff's prior lab results and the specialist's report. (*Id.*) Plaintiff stated he understood the plan. (*Id.*)

On January 29, 2009, and March 4, 2009, he was seen in sick call for complaints of hemorrhoids and low back pain, respectively. (*Id.* at 59–62). At both these appointments, he inquired about his hepatitis C treatment. (*Id.*) He was informed this would be discussed with him at his next Chronic Care Clinic. (*Id.*) On March 10, 2009, Plaintiff was transferred from FCI Estill to FCC Yazoo City. (*See* Entry #61-2).

II. Standard of Review

In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim. *Weller v. Department of Social Services*, 901 F.2d 387 (4th Cir. 1990). Nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c). The movant has the burden of proving that a judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that

there is a genuine issue for trial." The opposing party may not rest on the mere assertions contained in the pleadings. Fed. R. Civ. P. 56(e); *see also Celotex v. Catrett*, 477 U.S. 317 (1986).

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. *See* Fed. R. Civ. P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the non-moving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In the *Celotex* case, the court held that defendants were "entitled to judgment as a matter of law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements of his case with respect to which he has the burden of proof. *Celotex*, 477 U.S. at 322-323.

III. Analysis

Plaintiff's claims are based on constitutional rights and are brought against federal employees. As such, these claims are evaluated under *Bivens*, the case establishing that victims of a constitutional violation perpetuated by a federal actor may sue the offender for damages in federal court despite the absence of explicit statutory authorization for such suits. *Carlson v. Green*, 446 U.S. 14, 18 (1980); *see also Holly v. Scott*, 434 F.3d 287, 289 (4th Cir. 2006). A *Bivens* claim is analogous to a claim brought against state officials under 42 U.S.C. § 1983. Therefore, caselaw involving § 1983 claims is

applicable in *Bivens* actions, and vice versa. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814-820, n. 30 (1982); *see also Farmer v. Brennan*, 511 U.S. 825 (1994); *Bolin v. Story*, 225 F.3d 1234, 1241-1242 (11th Cir. 2000); *Campbell v. Civil Air Patrol*, 131 F.Supp.2d 1303, 1310, n. 8 (M.D.Ala. 2001) ("the court shall refer interchangeably to cases" decided under both § 1983 and *Bivens*).

    A.    Supervisory Liability of Defendants Rivera, Holt, and Lappin

Defendants Rivera, Holt, and Lappin contend that Plaintiff failed to make any actual allegations against them and they cannot be held liable on a theory of *respondeat superior* or vicarious liability. The doctrine of *respondeat superior* generally is inapplicable to *Bivens* suits, such that an employer or supervisor is not liable for the acts of his employees, absent an official policy or custom which results in illegal action. *See Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Fisher v. Washington Metro. Area Transit Authority*, 690 F.2d 1133, 1142–43 (4th Cir. 1982). Higher officials may be held liable for the acts of their subordinates, however, if the official is aware of a pervasive, unreasonable risk of harm from a specified source and fails to take corrective action as a result of deliberate indifference or tacit authorization. *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984), *cert. denied*, *Reed v. Slakan*, 470 U.S. 1035 (1985).

Plaintiff has not alleged that Defendants Holt and Lappin were personally responsible for his claim or acted in any way other than a supervisory role. Although Plaintiff alleges he submitted administrative remedies to Defendant Rivera, such allegations stem from her role as a supervisor and not from personal involvement in

Plaintiff's medical care. Further, Plaintiff has not shown that Defendants Rivera, Holt, and Lappin were deliberately indifferent to, or tacitly authorized, any of the actions or inactions of the FCI employees. Thus, Plaintiff fails to show that Defendants Rivera, Holt, and Lappin are liable on a theory of *respondeat superior* or supervisory liability, and the claims against these Defendants must be dismissed.

B. Medical Indifference

Plaintiff claims that Defendants' acts or omissions in treating his chronic hepatitis C constitute deliberate indifference to his serious medical needs. Furthermore, Plaintiff claims Defendants have "caused unnecessary pain and suffering, increased the difficulty of future treatment, decreased the efficacy of future treatment," and have caused "significant degenerative change" to his liver.

In the case of *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court reviewed the Eighth Amendment prohibition of punishments which "involve the unnecessary and wanton infliction of pain," *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976)). The court stated:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . . We therefore conclude that deliberate indifference to serious medical needs of a prisoner constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Estelle*, 429 U.S. at 103-105 (citations and footnotes omitted). Despite finding that "deliberate indifference to serious medical needs" was unconstitutional, the court was

careful to note, however, that "an inadvertent failure to provide adequate medical care" does not meet the standard necessary to allege an Eighth Amendment violation:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 107.

The Fourth Circuit has also considered this issue in the case of *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990). In that case, the court noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, . . . nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." *Id.* at 851 (citations omitted). Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. *Estelle*, 429 U.S. at 102–103; *Farmer v. Brennan*, 511 U.S. 825 (1994); *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986).

Further, incorrect medical treatment, such as an incorrect diagnosis, is not actionable under 42 U.S.C. § 1983 (or *Bivens*). *Estelle*, 429 U.S. at 105–106; *see Daniels v. Williams*, 474 U.S. 327, 328-36 & n. 3 (1986); *Davidson v. Cannon*, 474 U.S. 344, 345-48 (1986); *Ruefly v. Landon*, 825 F.2d 792, 793-94 (4th Cir.1987); *see also Pink v. Lester*, 52 F.3d 73, 78 (4th Cir. 1995) (applying *Daniels* and *Ruefly*: "The district court

properly held that *Daniels* bars an action under § 1983 for negligent conduct."); *see also Brooks v. Celeste*, F. 3d 125 (6th Cir. 1994) ("Although several courts prior to the Supreme Court's decision in *Farmer v. Brennan*, *supra*, held that 'repeated acts of negligence could by themselves constitute deliberate indifference, *Farmer* teaches otherwise."); *Sellers v. Henman*, 41 F.3d 1100, 1103 (7th Cir. 1994) ("If act A committed by the X prison shows negligence but not deliberate indifference, and B the same, and likewise C, the prison is not guilty of deliberate indifference."); *White v. Napoleon*, 897 F.2d 103, 108-109 (3rd Cir. 1990); *Smart v. Villar*, 547 F.2d 114 (10th Cir. 1976) (affirming summary dismissal).

Although the Constitution requires that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice. *Jackson v. Fair*, 846 F. 2d 811, 817 (1st Cir. 1988). Although the provision of medical care by prison officials is not discretionary, the type and amount of medical care is discretionary. *See Brown v. Thompson*, 868 F. Supp. 326 (S.D. Ga. 1994). Further, a disagreement as to the proper treatment to be received does not in and of itself state a constitutional violation. *See Smart v. Villar*, 547 F. 2d 112 (10th Cir. 1976); *Lamb v. Maschner*, 633 F. Supp. 351, 353 (D.Kan. 1986). Mistakes of medical judgment are not subject to judicial review in a § 1983 action (or *Bivens*). *Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975).

Plaintiff's BOP medical records describe in detail the continuing medical care provided to Plaintiff. Although Plaintiff may disagree with his course of treatment while

at FCI Estill, such a claim is not actionable under the Eighth Amendment. Furthermore, Plaintiff has not put forth any evidence indicating that he has been harmed as a result of the course of treatment by Dr. Vendel and the FCI Estill medical staff. Although Plaintiff claims the acts or omissions of Defendants have caused "unnecessary pain and suffering, increased the difficulty of future treatment, decreased the efficacy of future treatment," and have caused "significant degenerative change" to his liver, he provides no evidence in support of these claims of injury. Moreover, pain and suffering are not actionable under *Bivens*.

Furthermore, Plaintiff has sued non-medical personnel for his claim of medical indifference. Any claims of medical indifference as to non-medical personnel Defendants should be dismissed as Plaintiff has not shown that they interfered with his medical care. The Fourth Circuit has held that to bring a claim alleging the denial of medical treatment against non-medical prison personnel, an inmate must show that such officials were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct. *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990). Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. *Id.* Under these principles, Plaintiff has not alleged sufficient facts stating any claim against non-medical personnel Defendants.

Based on the evidence presented, there has been no deliberate indifference shown to the medical needs of Plaintiff. For the above stated reasons, summary judgment should

be granted in favor of Defendants on this issue.

C. Qualified Immunity

Defendants also assert that they are entitled to qualified immunity in their individual capacities. The Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 (1982), established the standard which the court is to follow in determining whether the defendant is protected by this immunity. That decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. at 818.

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998). As discussed above, Plaintiff has failed to present sufficient evidence to support her constitutional violation allegations.

Nevertheless, *assuming arguendo* that Plaintiff has presented sufficient evidence of a constitutional violation, Defendants are entitled to qualified immunity from suit.

In *Maciariello v. Sumner*, 973 F.2d 295 (4th Cir. 1992), the Fourth Circuit further explained the theory of qualified immunity:

> Governmental officials performing discretionary functions are shielded from liability for money damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Moreover, there are two levels at which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which this right applies to the actions of the official must also be apparent. Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.

*Maciariello*, 973 F.2d at 298.

In the instant case, Plaintiff has failed to establish any theory of liability upon the part of Defendants, and, furthermore, Plaintiff has failed to establish the existence of any constitutional deprivation. However, if the court were to find that Plaintiff has established some theory of liability upon the part of Defendants, and therefore, the existence of a constitutional deprivation, Defendants are still entitled to qualified immunity. The record before the court shows that as to Plaintiff and the specific events at issue, these Defendants performed the discretionary functions of their respective official duties in an objectively reasonable fashion. They did not transgress any statutory or constitutional rights of Plaintiff that they were aware of in the discretionary exercise of their respective professional judgments. Thus, to the extent the district judge finds that a constitutional violation occurred, these Defendants are entitled to qualified immunity.

IV. Conclusion

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment [Entry #61] be granted and this case be dismissed in its entirety.

IT IS SO RECOMMENDED.

July 28, 2010  
Florence, South Carolina

Shiva V. Hodges  
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**